# IN THE COURT OF APPEALS OF IOWA

No. 18-2060
Filed November 27, 2019

**ANTHONY MARTIN COLLINS, JR.,**
      Petitioner-Appellant,

**vs.**

**VERONICA MARIE NATERA, n/k/a VERONICA MARIE LANDALS,**
      Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

Anthony Collins Jr. appeals the district court's denial of his petition to modify physical care of the parties' child. **AFFIRMED AS MODIFIED.**

Jaclyn M. Zimmerman of Miller, Zimmerman & Evans P.L.C., Des Moines, for appellant.

Diane L. Dornburg of Carney & Appleby, P.L.C., Des Moines, for appellee.

Considered by Vaitheswaran, P.J., Potterfield, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**MAHAN, Senior Judge.**

Anthony Collins Jr. (Tony) appeals the district court's denial of his petition to modify the parties' paternity decree to order physical care of the parties' child with him rather than the child's mother, Veronica Landals.  Upon our review, we affirm the order entered by the court, but we conclude equity requires that Veronica pay for the child's travel costs necessary to facilitate visitation with Tony, and we modify the order in that regard.

## I.    *Background Facts and Prior Proceedings*

Tony and Veronica had an "on and off" relationship between 2011 and 2013.  Their child, A.C., was born in 2013, shortly after they separated.  Veronica also has two older children from prior relationships.[1]

In 2014, Tony filed a petition to establish paternity and custody, requesting physical care of A.C., or in the alternative, shared physical care.  In 2015, following a two-day trial, the district court entered an order placing A.C. in Veronica's physical care.  The court found, "Shared care is not in the best interest of [A.C.]" because "the parties do not have a history of cooperation with each other and that is likely to continue."  The court further noted the parties' "history of allowing other individuals to influence their interpersonal relationship which only resulted in further needless turmoil."  The court found, "Veronica more so than Tony has shown that she is better at caring for [A.C.]" and A.C. "is bonded to her half-sibling" in Veronica's home.  The court awarded Tony visitation with the child every

---

[1] Veronica's oldest child is an adult.

Wednesday overnight and every other Thursday to Saturday. The court ordered Tony to pay child support in the amount of $552 per month.

Both parties have since married—Veronica married Jay in 2015 and Tony married Mindy in 2017. Jay has four children (ages seventeen to twenty-one years old), and Mindy has two children (ages nine and fifteen). It appears these other relationships have, whether purposefully or inadvertently, instigated problems between Tony and Veronica. For example, Tony believed Veronica encouraged A.C. to call Jay "Dadda," which Tony objected to, because "there's only one mom, and there's only one dad." Tony emphasized that he would not encourage A.C. to call Mindy "mom." Jay, who had lived with A.C. nearly all the child's life, had developed a close bond with the child and openly shared his feelings in that regard on social media, further fueling Tony's animosity toward the situation.

During the summer of 2017, in the midst of discussions between the parties regarding Tony's request for an extension of a right of first refusal to care for A.C. while Veronica was at work, Veronica unilaterally hired Mindy's ex-husband's wife as A.C.'s daycare provider. Veronica was aware the two women had a "very poor" relationship. Aside from the clearly questionable nature of her daycare-provider decision, Veronica later acknowledged it was "[p]robably" better for A.C. to be with Tony rather than at daycare. Veronica acknowledged she was "[p]ossibly" being difficult to deal with but said it "goes both ways."

In September 2017, Veronica emailed Tony advising him she was filing for modification because she and Jay were planning to move to Texas. According to Veronica, the decision was "not easy" and was made "after careful thought and much planning about schools, communities, career opportunities, homes, and

future planning." Veronica requested she and Tony work together to "create our own terms of agreement" for visitation. Tony responded that he was "shocked and saddened" by the email, stating, "I do not want you to move and I do not want [A.C.] to ever have to be without one of us."

Veronica then filed a petition for modification, alleging her plan to relocate to Texas was a substantial change in circumstances warranting modification of Tony's visitation. Tony filed an answer and counterclaim, alleging, "It is not in the best interests of the minor child to move out of state, further diminishing her relationship with her father and siblings." He requested the paternity decree be modified to grant him physical care of the child, set a visitation schedule for Veronica, and order Veronica to pay child support.

A trial took place over three days in October 2018, at which the district court received testimony from Veronica, Tony, Jay, as well as Veronica's ex-husband and Jay's sister. Veronica, Jay, and A.C. had moved to Spring, Texas in December 2017. Prior to the move, Jay's seventeen-year-old son, of whom Jay had physical care, elected to move to Omaha to live with his mother. And Veronica's fourteen-year-old daughter, of whom Veronica had shared care, elected to remain in the Des Moines area with her father. Modification proceedings with regard to those children were pending or complete by the time of trial in this matter.

Veronica works night shifts as an emergency room nurse. She described an improved work environment at a "magnet hospital, which is pretty much every nurse's dream to work in." Veronica makes $40.50 per hour, as opposed to $29.70 per hour she was making in Iowa. Veronica testified about her research that Iowa "rank[ed] 50th in pay" for nurses, which "played a role in my wanting to leave Iowa

. . . and not be a nurse in Iowa anymore." Veronica testified the family now lived in a "safer neighborhood" and A.C. would attend a well-rated school. Jay, who has worked for FedEx as an airport ramp agent for twenty-one years, testified that in Iowa he was he was at the "top of the pay scale" and made just under $29 per hour. Now Jay earns $30.78 per hour, and he testified there are more opportunities for growth because the Houston airport is a much larger market. He also testified the warmer climate in Texas was a perk given the outdoor-nature of his job.

Tony lives in Grimes with Mindy and her two children. He works as a paramedic in Story County, and he also works part-time for the Bondurant Fire Department. Mindy works at a medical clinic in Waukee. Tony's parents live nearby and spend time with A.C. when she is in Iowa. Tony believed it was in A.C.'s best interests "to be here with her father and close to her family." He stated that he has a "great relationship" with A.C., but he believed Veronica "minimalizes" him and does not respect him as A.C.'s father. Tony described Veronica as being "deceitful and manipulative to get her way." Tony believed "this entire move was to take [A.C.] away from me." He pointed out that now A.C. is separated from Veronica's daughter, who lives in Waukee with her father, which was "one of the big reasons [Veronica] wanted primary care" in the first place—to keep the half-siblings together.

Tony acknowledged A.C. has been in Veronica's physical care since she was born and "it [would] be somewhat of a transition" to change that, but he opined that A.C. "transitions here extremely well." Veronica testified she and Jay moved to provide better opportunities for their family, and she believed she was better equipped than Tony to provide for A.C.'s long-term best interests. Veronica

testified it "would hurt [A.C.] tremendously" if the child was not able to see her on a regular, consistent basis.

A.C., who was five-years-old, was described as a "ball of joy," "sensitive," "inquisitive," and "intelligent." A.C. was active, excited "to learn new things," and was on track to begin kindergarten in the fall of 2019. Veronica testified A.C. "gets really excited" when she talks to Tony or "when she gets to come back to Iowa to visit him." According to Veronica, "I have no doubt in my mind that he loves her and that she loves him." Tony believed Veronica is a "good mom," and he had "no doubt" about her ability to care for A.C. Both parties agreed they could "work together" to parent A.C.

The district court entered an order granting Veronica's request to modify the visitation schedule and denying Tony's request to modify physical care. The court concluded the record did not establish a change in circumstances resulting from Veronica's relocation, or from Veronica's alleged lack of support for Tony's relationship with A.C., to justify a modification of physical care. The court further found Tony had not established "that he is in a better position to provide superior care for the child as compared to [Veronica]." However, the court found Veronica's relocation was a change of circumstances warranting modification of the visitation schedule. The court incorporated each parties' respective requests for appropriate visitation and ordered Tony to have visitation with A.C. for six weeks during the summer (to be exercised in four- and two-week blocks), every spring break, and half of holiday breaks. The court also ordered, "Either party may exercise additional time with the child should that party be in the state where the child is located." The court ordered, "Each party shall be responsible for providing

transportation for the child at the beginning of their scheduled time with the child."
Tony appealed.

## II.    *Standard of Review*

We review this modification action de novo.  Iowa R. App. P. 6.907; *In re Marriage of Johnson*, 781 N.W.2d 553, 554 (Iowa 2010).  We give weight to the fact findings of the district court, especially in determining witness credibility, but are not bound by them.  *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015).

## III.   *Modification of Physical Care*

As the party seeking modification of A.C.'s physical care, Tony bears a heavy burden.  *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).  This is because once the custody and care of a child has been fixed, it should be disturbed only for the most cogent reasons.  *Id.*  A.C.'s "best interest is the 'controlling consideration.'"  *Cf. Hoffman*, 867 N.W.2d at 32 (citation omitted).

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change.  The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary.  They must relate to the welfare of the children.  A parent seeking to take custody from the other must prove an ability to minister more effectively to the children's well being.

*Id.* (quoting *Frederici*, 338 N.W.2d at 158).

"A decision by a joint custodial parent with physical care of children to move out-of-state is obviously the kind of decision the other joint custodian has a right to be consulted about."  *Frederici*, 338 N.W.2d at 159.  However, "the parent having physical care of the children must, as between the parties, have the final say

concerning where their home will be. This authority is implicit in the right and responsibility to provide the principal home for the children." *Id.* "And in our 'highly mobile society' . . . periodic relocation is hardly a surprise." *Hoffman*, 867 N.W.2d at 33 (quoting *Frederici*, 338 N.W.2d at 160).

Factors the court considers in evaluating whether a relocation undermines the best interests of the child, are (1) the "motive for the move"; (2) the "location, distance, and disruption"; (3) the "child['s] preferences"; and (4) "relative advantages and disadvantages of the [new] residence." *Id.* at 33–36. Here, the district court found A.C. "has not expressed a preference, nor is she old enough to have her preferences given any weight in the analysis" and "neither party has offered any empirical data or similar evidence in an effort to evaluate the pros and cons of living in Texas as compared to Des Moines." Accordingly, the court focused its analysis on the first and second factors set forth above to reach its conclusion that Tony had failed to meet his burden to prove A.C.'s move constitutes a substantial change of circumstances affecting her best interests.

Tony challenges the court's ruling on appeal, claiming "the credible evidence shows that Veronica's motivation to move was specifically to geographically separate" him from A.C. To support his contention, Tony points to the subpoenaed testimony of Jay's sister (stating "it was Veronica's desire to get out of Des Moines and get [A.C.] away from Tony to avoid any more appearances in court") and Veronica's ex-husband (stating "[Veronica] did point out that a big reason [for the move] was because she did not want to raise [A.C.] in the same school district as Tony"). While we acknowledge the record is replete with messy testimony painting a picture of the various opinions regarding the proper outcome

of this case, the district court expressly gave the testimony of Jay's sister and Veronica's ex-husband "no weight" on this point due to their "lack[] of credibility."[2] We defer to the district court's ability to see the parties testify in person, and we give weight to credibility determinations of the district court. *In re Marriage of Eggeling*, No. 18-0234, 2019 WL 478818, at *1 (Iowa Ct. App. Feb. 6, 2019).

In any event, the court noted it was "satisfied that the relocation was motivated by [Veronica's] and Jay's desire to improve their career prospects in that state." As the court found:

> The record establishes that the move had been contemplated for some time, and the objective criteria analyzed by [Veronica] (including the higher pay afforded nurses in Texas, Jay's increased marketability with Federal Express as a result of working at a major international airport and the absence of a state income tax) supports the ultimate decision to move to Texas. A move to obtain or better one's employment is a legitimate reason to relocate, absent proof that the move was more consistent with a desire to defeat the other parent's visitation rights or undermine his relationship with the children. . . .
> . . . . This is not a case where [Veronica] and Jay have impulsively decided to pull up stakes and move across the country for no good reason.

On our de novo review of the record, we agree with the court's findings.

Tony also argues, "The new location, its distance from the noncustodial parent, disruption for the child[] and relative advantages and disadvantages of the new residence support an award of primary physical care to Tony."[3] In particular,

---

[2] Indeed, the court stated, "To the degree the trial testimony offered by [Veronica's ex-husband] and [Jay's sister] supports [Tony's] position in this regard, the court gives their testimony no weight as lacking in credibility as a result of the lack of written corroboration and what the court perceives as their animosity exhibited toward [Veronica] and/or Jay."

[3] The district court did not analyze the relative advantages and disadvantages of Iowa and Texas (observing "neither party has offered any empirical data or similar evidence in an effort to evaluate the pros and cons of living in Texas as compared to Des Moines"), and Tony does not present any such evidence on appeal to support his claim. Accordingly, we decline to specifically address that factor.

Tony claims the move to Texas "is highly disruptive" to A.C.'s relationships with him, her extended family, and her half- and step-siblings. There is no doubt the distance between A.C. and these relatives will affect those relationships. However, we agree with the district court that "[s]ome of this disruption can be and has been mitigated by the scheduling of extended visitation over summers and school breaks, as well as extended contact through such media as FaceTime, Skype, etc."

Both Veronica and Tony testified A.C. is doing well and has a good relationship with all her family members. Their testimony also supports the conclusion that A.C. is happy, well-adjusted, thriving in her home in Texas, and enjoys her visits to Iowa. Tony testified that he has "struggled" with A.C.'s move and admitted that he has told the child "it's not fair that she's so far away from [him]." But "[p]hysical care issues are not to be resolved upon perceived fairness to the [*parents*,] but primarily upon what is best for the *child*." *Hansen*, 733 N.W.2d at 695 (emphasis in original). On our de novo review of the record, we agree with the district court's finding that "[t]o the degree that [Veronica] was initially chosen as [A.C.]'s caregiver based on her relative stability, she has been able to maintain that stability despite the relocation." Because Tony has not established a substantial change in circumstances to warrant modification of physical care,[4] we affirm.

---

[4] In light of this conclusion, we need not reach Tony's contention that he "has the ability to provide superior care to [A.C.]" And Tony does not challenge the modified visitation provisions ordered by the court.

## IV. Transportation Costs

The district court ordered, "Each party shall be responsible for providing transportation for the child at the beginning of their scheduled time with the child." Tony contends "it is equitable to make Veronica the party responsible for transportation to facilitate [his] parenting time." To support his contention, Tony points to Veronica's ability to obtain inexpensive airfare for A.C. as a perk of Jay's employment with FedEx.[5] Tony also points out that Veronica earns significantly more than he does and is in a superior position to provide transportation for A.C.[6] Tony claims, "[D]ue to Veronica's access to inexpensive travel, the disparity of income, and the voluntary nature of her relocation, Veronica should be responsible for all, or a higher portion, of the cost of facilitating visitation." Veronica does not respond to Tony's claim.

If a parent who is awarded physical care of a child relocates 150 miles or more from where the child lived at the time of a decree, the court may consider the move a substantial change in circumstances, as the court did here in order to modify the parties' visitation schedule. *See* Iowa Code § 598.21D (2017). "The modification may include a provision assigning the responsibility for transportation of the minor child for visitation purposes to either or both parents." *Id.*

---

[5] Veronica testified, "Jay receives a benefit through his work since it's an airline, so through a web site we get discounted [standby] airline tickets."

[6] For example, Tony testified, "After receiving notification that my daughter was going to be taken to Texas, I knew that I would have a fight on my hands and it was going to cost a lot of money, so I started working a lot at the fire department on my time off from Story County." Tony also testified he would have visited A.C. in Texas "every weekend" if he could have, but had yet to be able to do so due to "[t]ime off work, the expense of hotels, staying down there, cost of driving and flying down there."

We conclude the district court's equal division of transportation costs was not equitable. Veronica chose to relocate to Texas, and her testimony conveyed many subjective reasons the move benefited her family. *See generally In re Marriage of Beecher*, 582 N.W.2d 510, 514 (Iowa 1998) (concluding that a downward departure from the child support guidelines was not justified even though father was bearing eighty percent of transportation costs for the children, noting that a move to California was for his personal benefit). Indeed, Veronica testified she and Jay now earn more in Texas, their housing costs have improved, and she is able to provide low-cost airfare for A.C. With the exception of a few instances, Veronica testified she has voluntarily agreed to provide for A.C.'s transportation costs.[7] And it seems Veronica realizes her leverage on Tony when it comes to A.C.'s transportation. The record shows a trend of Veronica displaying control over A.C.'s travel, and sadly some of Veronica's actions have been to A.C.'s detriment.[8]

On our de novo review, we conclude equity requires that Veronica pay for A.C.'s travel costs necessary to facilitate visitation. *See In re Marriage of Ginger*,

---

[7] This was despite the parties' mediation agreement "related to some temporary parenting time and transportation provisions" between December 2017 and April 2018, which required each parent to provide the transportation necessary to facilitate the exchange of A.C. at the beginning of his or her parenting time.

[8] For example, in March 2018, the night before a planned exchange of A.C. in Tulsa, Veronica text-messaged to Tony, "I can save you the trip and fly her to DSM tomorrow if you agree to have her passport application completed and notarized by the time she return on April 7th." When Tony responded, "Per my lawyer's advice, I am not signing the application at this time . . . . ," Veronica stated, "See you in Tulsa." Veronica later admitted it would have been better for A.C. to fly rather than drive.

On another occasion, Veronica failed to notify Tony when she and A.C. were unable to get on a flight to Texas and stayed an extra night in Des Moines; Veronica waited until they were back in Texas to notify Tony. Veronica agreed that in hindsight she should have let him know sooner.

No. 13-1908, 2014 WL 5478145, at *3 (Iowa Ct. App. Oct. 29, 2014) ("Though we understand the need to relocate for one's career, the move was nonetheless Tracy's sole decision, and given the parties' relative income, the resulting cost of transporting the children should not fall on Tanya. We therefore conclude the district court failed to do equity when it ordered Tanya to pay for the children's transportation costs when the children travel from Georgia back to Iowa. Consequently, Tracy will be responsible for all transportation costs regarding the children's visits to Georgia." (citation omitted)); *see also In re Marriage of Yazigi & Nahra*, No. 13-1553, 2015 WL 1046129, at *3 (Iowa Ct. App. Mar. 11, 2015) ("[W]e conclude the district court's equal division of the transportation costs was not equitable. Relocating the children to Canada is wholly Tony's choice. Tony has income of approximately $84,000 per year, and he testified at trial that he expects to earn substantially more in Canada while also having significantly less living expenses. Rima has negligible income and is required to pay Tony $445 per month in child support. Tony will be required to pay for all of the children's travel costs necessary to facilitate visitation."); *In re Marriage of Worzala*, No. 09-1191, 2012 WL 2757127, at *1–2 (Iowa Ct. App. July 14, 2010) (affirming court's order holding the father entirely responsible for transportation costs after his move to Georgia, stating, "Andrew elected to move for his personal benefit. There is no evidence that the company he worked for insisted on or even encouraged the move as a condition of continued employment. Rather, Andrew made a lateral transfer to Georgia hoping the new position would eventually reap monetary benefits").

We note a concern that if Veronica is responsible for all transportation expenses—and scheduling, to the extent that she described standby travelers as needing to be "very flexible"—that Veronica will have no incentive to cooperate with Tony on the dates and times of visits. *Cf. In re Cariaso*, No. 03-1174, 2004 WL 360546, at *3 (Iowa Ct. App. Feb. 27, 2004) ("Both parents are charged with maintaining the best interests of the child, and thus with cooperating with visitation." (citing *In re Marriage of Toedter*, 473 N.W.2d 233, 234 (Iowa Ct. App. 1991)). Unfortunately, the record substantiates this concern. However, we believe Veronica is capable of acting in the child's best interests going forward to facilitate visitation with Tony. *See In re Marriage of Rykhoek*, 525 N.W.2d 1, 4 (Iowa Ct. App. 1994) (stating liberal visitation rights is generally considered to be in a child's best interests); *In re Marriage of Ruden*, 509 N.W.2d 494, 496 (Iowa Ct. App. 1993) (holding a child should be assured the opportunity for the maximum continuing physical and emotional contact with both parents). Accordingly, we modify the court's order with respect to transportation costs, as set forth above.

## V. Appellate Attorney Fees

Both parties seek an order requiring the other to pay their appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests within this court's discretion. *Markey v. Carney*, 705 N.W.2d 13, 25-26 (Iowa 2005). We consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.* at 26. We decline to award appellate attorney fees to either party.

**AFFIRMED AS MODIFIED.**